UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO.  05-50

VICKIE J. O'NEAL,                                                                    PLAINTIFF,

v.                                          **OPINION AND ORDER**

KILBOURNE MEDICAL LABORATORIES, INC.
and THE CASTLETON GROUP, INC.,                                       DEFENDANTS.

\* \* \* \* \* \* \* \* \*

This matter is before the Court on the Plaintiff's Motion for Conditional Certification of

Collective Action and for Court-Approved Notice to Members of Collective Class (Rec. No. 27);

the Plaintiffs' Motion to Extend Deadline to file Rule 26(a)(2) Expert Disclosures, to Complete

Discovery and to File Dispositive Motions (Rec. No. 30); the Plaintiff's Motion for Summary

Judgment (Rec. No. 34); and the Defendants' Motion for Summary Judgment (Rec. No. 35).

**I.       FACTS.**

**A.       O'Neal's Employment for Defendants.**

The Plaintiff, Vickie J. O'Neal was employed by the Defendants as a phlebotomist.  (Rec.

No. 1, Complaint ¶ 4). The Defendants assert that they were co-employers of O'Neal.  (Rec. No. 35,

Defs.' Mot. for Summ. J. at 17).  In her employment for the Defendants, O'Neal traveled from her

residence in Shelbyville, Kentucky to various locations in Kentucky, Ohio and Indiana to obtain

blood samples from individuals and to return the blood samples to hospitals located within

Kentucky, Ohio and Indiana or to the Kilbourne Medical Laboratories located in Lexington,

Kentucky and Cincinnati, Ohio.  (Rec. No. 1, Complaint ¶ 6).

Defendant Kilbourne Medical Labs, Inc. ("Kilbourne") provides medical laboratory services

to health care providers such as nursing homes.  (Rec. No. 28, Response at 1).  Kilbourne employs phlebotomists who are typically assigned to work a shift during which they travel to nursing facilities, draw blood or obtains other specimens from patients, and then take those specimens back to Kilbourne's laoratory near Batavia, Ohio. (Rec. No. 28, Response at 1). Kilbourne's laboratory technicians then process the specimens and report the results to nursing facilities. (Rec. No. 28, Response at 2).  Defendant Castleton Group, Inc. provides human-resource related functions for Kilbourne and other employers. (Rec. No. 1, Complaint ¶ 10; Rec. No. 28, Response at 2).

Kilbourne hired O'Neal in or about September 2003 as a phlebotomist.  (Rec. No. 1, Complaint ¶ 11; Rec. No. 27, Motion for Conditional Certification of Class at 2).  She serviced nursing facilities principally in the Lexington and Louisville, Kentucky areas and southern Indiana. (Rec. No. 28, Response at 2).

### B.      O'Neal's Claim for Overtime under the FLSA.

O'Neal asserts that she and other phlebotomists working for the Defendants were entitled to time and a half for all hours worked in a week in excess of 40 hours. (Rec. No. 1, Complaint ¶ 14). In her Amended Complaint, O'Neal explains that her workday began at 6:00 a.m. at her house and ended upon her return home, which constituted a 12-hour workday. (Rec. No. 20, Amended Complaint ¶ 1).

O'Neal asserts that the Defendants paid her and other phlebotomists less than time and a half for overtime hours (Rec. No. 1, Complaint ¶¶ 8, 12). O'Neal asserts that, with these actions, the Defendants violated the Fair Labor Standards Act ("FLSA") at 29 U.S.C. § 207. (Rec. No. 1, Complaint ¶¶ 7, 17). Section 207 of the FLSA prohibits employers from employing employees for a workweek longer than forty hours "unless such employee receives compensation for his

employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).

O'Neal asserts that, instead of paying phlebotomists time and a half for overtime hours, the Defendants would pay her "bonuses" for overtime hours which amounted to less than the required time and a half rate.  (Rec. No. 1, Complaint ¶ 13; Rec. No. 27, Motion for Conditional Certification of Class at 2).  O'Neal purports to bring this action as a collective action pursuant to Section 216(b) of the FLSA on behalf of herself and approximately 300 other phlebotomists that work or worked for the Defendants. (Rec. No. 1, Complaint ¶¶ 7, 26). O'Neal asserts that she and other employees are entitled to back pay for all overtime hours worked.  (Rec. No. 1, Complaint ¶ 23).

### C.    Defendants Cease Making "Bonus" Payments.

Defendants assert that they have always paid their phlebotomists on an hourly basis and overtime pay at one and one-half times their regular rates.  (Rec. No. 28, Response at 3).  Defendants assert that they occasionally paid phlebotomists lump sum bonuses for performing work beyond their regular assignments.  (Rec. No. 28, Response at 3). Defendants assert that, when they paid a bonus to a phlebotomist for performing extra work, they did not include the time the phlebotomist spent performing the extra work in the phlebotomist's hours when calculating the phlebotomist's regular pay.  (Rec. No. 28, Response at 3).

Defendants concede that in some work weeks this practice resulted in phlebotomists not receiving overtime pay to which they would have been entitled under the FLSA if they were not exempt from the provisions of that act.  (Rec. No. 28, Response at 3). Defendants assert that in May 2005, they first learned that their bonus practice may be inappropriate as to non-exempt employees depending on the number of hours worked, and that the Defendants then discontinued the practice.

3

(Rec. No. 28, Response at 5). Defendants assert that the last bonuses were paid for the work week ending May 27, 2005.  (Rec. No. 28, Response at 3).

**D.    Defendants Pay Back Wages for Overtime Hours to Phlebotomists.**

Defendants assert that after that time, they reviewed their wage payments to phlebotomists to determine if they owed them back wages for overtime hours. (Rec. No. 28, Response at 5).  They assert that they first identified all bonus payments made to phlebotomists.  For each such payment, they determined the work week in which the bonus was earned and the amount of time the phlebotomist worked in that week attributable to the bonus payment. Defendants assert that they then recalculated the phlebotomists' pay to determine if any additional pay would be due when it counted as regular hours the hours the employee worked performing the task for which the bonus was paid. (Rec. No. 28, Response at 5).  Defendants assert that for this process, they assumed that all of the phlebotomists who received a bonus payment were not exempt from the FLSA.  (Rec. No. 28, Response at 5).

Defendants assert that in February 2006 they submitted the results of this audit and the underlying data and calculations to the Cincinnati office of the Wage and Hour Division of the Department of Labor.  (Rec. No. 28, Response at 5). Defendants state that, on March 28, 2006, a DOL investigator conducted an on-site review of Kilbourne's audit and records, met with Kilbourne and Casteleton managers and conducted private interviews of Kilbourne employees.  (Rec. No. 28, Response at 5).

On April 8, 2006, the DOL approved the amount of back wages due to the phlebotomists and former phlebotomists assuming they were not exempt from the FLSA requirements, and agreed to supervise the payments of the back wages to the phlebotomists.  (Rec. No. 28, Response at 6).   The

4

DOL approved the amounts as the full amount due and provided receipt and release forms to those employees and former employees to whom checks were sent. (Rec. No. 28, Response at 6). At that time, O'Neal had already filed this action and, thus, was excluded from the DOL's process. (Rec. No. 28, Response at 6 n.7).

Kilbourne asserts that 59 of its current and former phlebotomists, not including O'Neal, had received bonuses. (Rec. No. 28, Response at 6). Nine of those phlebotomists did not work more than 40 hours in any work week in which they received a bonus, including the amount of time spent performing the work to earn the bonus, and therefore had not worked overtime and were not due any additional pay. (Rec. No. 28, Response at 6). Kilbourne sent or delivered back-wage checks in the amounts approved by the DOL to each of the other 50 Kilbourne phlebotomists and former phlebotomists who, if not exempt, would have been due additional overtime pay under the FLSA. (Rec. No. 28, Response at 3). Each check was accompanied by a receipt and release of claims form provided by the DOL. (Rec. No. 28, Response at 6).

Kilbourne asserts that 44 of the 50 phlebotomists and former phlebotomists accepted the checks sent to them as the full amount he or she was due and signed the DOL's receipt and release of claims form. Of the six remaining phlebotomists, one former phlebotomist is now deceased; three former phlebotomists cashed the checks but have not yet returned their signed receipt forms; and Kilbourne and the DOL have been unable to locate two of the other former phlebotomists. (Rec. No. 28, Response at 6-7).

The Defendants submit the affidavits from two employees which support their assertions regarding the DOL audit process and the back-wage payments that were sent to the phlebotomists. (Rec. No. 28, Ex., Patrick & Terris Aff.). The Defendants also submit the DOL receipts signed by

5

44 of its current or former phlebotomists.  Each receipt states "**Notice to Employee under the Fair Labor Standards Act –** Your acceptance of back wages due under the Fair Labor Standards Act means that you have given up any right you may have to bring suit for such back wages under Section 16(b) of that Act."  (Rec. No. 28, Terris Aff., Ex. A).

      **E.**      **O'Neal's State Law Claims.**

O'Neal's original Complaint asserted only a FLSA claim.  (Rec. No. 1, Complaint ¶¶ 21 - 38). O'Neal later amended her complaint to assert a claim that Defendants violated Kentucky's Wage and Hours Law at KRS §§ 337.020 and 337.285 by paying her and other employees less than time and a half for overtime hours. (Rec. No. 20, Amended Complaint ¶¶ 1, 2). With her Amended Complaint, O'Neal also asserts that the Defendants ultimately fired her in retaliation for complaining about the Defendants' pay practices.  (Rec. No. 20, Amended Complaint ¶ 1).  As to this claim, O'Neal specifically asserts that "Defendants wrongfully terminated Plaintiff against the public policy of Kentucky and in retaliation for her demands to comply with the Federal and State Wage and Hour Laws."(Rec. No. 20, Amended Complaint ¶ 1). In her response to the Defendants' Motion for Summary Judgment, O'Neal clarifies that "[t]his is a wrongful discharge claim falling within Kentucky's narrow exception to the at-will-employment doctrine."  (Rec. No. 38, Response at 7). In support of this claim, O'Neal then cites *Grzyb v. Evans*, 700 S.W.2d 399 (Ky. 1985) and *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730 (Ky. 1984), two cases dealing with a wrongful discharge claim under Kentucky law. (Rec. No. 38, Response at 7-8).  O'Neal asserts that she has an "actionable wrongful-discharge claim under Kentucky law."  (Rec. No. 38, Response at 9).

With her Amended Complaint, O'Neal also appears to assert a claim that Defendants breached a promise contained in the Employee Handbook that O'Neal would be paid for travel time.

(Rec. No. 20, Amended Complaint ¶ 1).

##### II.   ANALYSIS.

##### A.   O'Neal's Motion for Conditional Certification of Collective Action and for Court-Approved Notice to Members of Collective Class (Rec. No. 27).

O'Neal filed this action on July 14, 2005, asserting that the Defendants violated Section 207

of the FLSA when they failed to pay her and other employees time and a half for overtime hours. On

June 13, 2006, she filed a motion requesting conditional certification of a collective action pursuant

to Section 216(b) of the FLSA which provides, in relevant part, the following:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. *An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.* No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b)(emphasis added).

The Defendants asserts that, as a result of the settlement approved and supervised by the

DOL, there are no similarly situated employees or former employees who could opt in as additional

plaintiffs. The Defendants argue that all the other potential plaintiffs are precluded from joining this

lawsuit under 29 U.S.C. § 216(c). That section provides, in relevant part, that:

> The Secretary [of Labor] is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under section 206 or section 207 of this title, and the agreement of any

employee to accept such payment shall upon payment in full constitute a waiver by such employee of any right he may have under subsection (b) of this section to such unpaid minimum wages or unpaid overtime compensation and an additional equal amount as liquidated damages.

29 U.S.C. § 216(c).

In order to proceed as a "collective action" pursuant to § 216(b), O'Neal must demonstrate that she is "similarly situated" to the employees she seeks to notify of this suit. In order to determine whether O'Neal has made this showing, the Court will follow the "two-stage class certification method." *See Olivo v. GMAC Mortg. Corp.,* 374 F.Supp.2d 545, 547 (E.D. Mich. 2004)(citing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.1987); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir.2001); *Mooney v. Aramco Services Co.*, 54 F.3d 1207 (5th Cir.1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)); *White v. MPW Industrial Services, Inc* 236 F.R.D. 363, 366 (E.D. Tenn. 2006)("Although some courts have recognized the use of other tests for determining whether Plaintiffs and putative plaintiffs are similarly situated for purposes of § 216(b), the greater weight of authority suggests that a two-step analysis is the proper test"). In *Olivo*, the court explained the first stage of this two-stage method as follows:

> Under the first step of the two-stage method, the Court determines whether Plaintiffs have demonstrated other "similarly situated" putative plaintiffs for "notice" purposes. With this step, "[a] named plaintiff can show that the potential claimants are similarly situated 'by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.' " *Flores v. Lifeway Foods, Inc.*, 289 F.Supp.2d 1042, 1045 (N.D.Ill.2003). See *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F.Supp.2d 101, 104 (S.D.N.Y.2003); *Roebuck v. Hudson Valley Farms*, 239 F.Supp.2d 234, 238 (N.D.N.Y.2002) (citing *Realite v. Ark Restaurants Corp.*, 7 F.Supp.2d 303, 306 (S.D.N.Y.1998)); *Kane v. Gage Merch. Servs.*, 138 F.Supp.2d 212, 215 (D.Mass.2001) (quoting *Hoffmann v. Sbarro, Inc.* 982 F.Supp. 249, 261 (S.D.N.Y.1997)); *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 364 (M.D.Ala.1999). This initial standard is fairly lenient, and in order to meet this

8

standard, Plaintiffs must simply "submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exists." *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266 (D.Minn.1991). Courts requiring a factual showing under the first step of a *Lusardi*-type determination have considered "factors such as whether potential plaintiffs were identified; whether affidavits of potential plaintiffs were submitted; ... whether evidence of a widespread discriminatory plan was submitted[,]" *H. & R. Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D.Tex.1999), and whether "[a]s a matter of sound case management, ... a manageable class exists." See *Severtson*, 137 F.R.D. at 266. If Plaintiffs are able to make this showing, the Court will authorize Plaintiffs to proceed with this action as a "collective action" and will allow Plaintiffs to notify putative class members of the pendency of this suit. This initial authorization has been called a "conditional certification" a certification conditioned upon Plaintiffs being able to satisfy the second step of the two-stage approach. *See Mooney*, 54 F.3d at 1214.

*Olivo*, 374 F.Supp.2d at 547-48.

In *White v. MPW Industrial Services, Inc.*, 236 F.R.D. 363 (E.D.Tenn.,2006), the district court explained that, "[a]t the notice stage, the district court makes a decision--usually based only on the pleadings and any affidavits which have been submitted-- whether notice of the action should be given to potential class members. Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." *Id*. at 366 (quoting *Mooney,*54 F.3d at 1213-14). "Various courts have described a plaintiff's burden at the notice stage as requiring the following: a 'modest factual showing' that the named plaintiff and putative plaintiffs together were victims of a common policy or plan that violated the law." *Id*. at 367 (citing cases).

If the Court should conditionally certify a class, then during the second stage of the two stage process, "following the close of discovery, Defendant would have had the opportunity to file a Motion challenging the initial determination to allow the case to proceed as a 'collective action,' and the Court would have applied a stricter standard to determine whether the putative class of plaintiffs

9

were 'similarly situated' to the named Plaintiffs." *Olivo*, 374 F.Supp. 2d at 548 n.2.  The second stage generally begins with a motion for decertification filed after discovery is largely complete and the matter is ready for trial.  *MPW Industrial Services. Inc.*, 236 F.R.D. at 366. "At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives--i.e., the original plaintiffs--proceed to trial on their individual claims." *Id.*

O'Neal did not move for conditional certification of a class until nearly a year after filing this action. Pursuant to the Scheduling Order, discovery in this matter had been under way for about six months before O'Neal moved for conditional certification.  Thus, it is appropriate in this case to require O'Neal to make a "modest factual showing" that she and the other putative plaintiffs together were victims of "a common policy or plan that violated the law."

O'Neal asserts that she has made this showing with her complaint and deposition and the "documents produced by the Defendants including the employee handbook, timesheets and payroll information."  O'Neal does not identify the portions of these documents upon which she relies to make a factual showing that the Defendants had a common policy or plan that violated the law. Further the Court has been unable to locate any timesheets or payroll information in the record of this matter.

In addition, the Defendants have submitted evidence that, assuming that none of their phlebotomists were exempt from the FLSA overtime requirements, the Defendants owed overtime pay to 50 of their current and former phlebotomists and that they submitted these audit results to the

10

DOL who approved the amounts due each phlebotomist and agreed to supervise back-wage payments to the phlebotomists. The Defendants have also submitted evidence that 44 of these phlebotomists signed DOL receipt and release forms in which they waived any claim they had under the FLSA. The Defendants have further submitted evidence that three additional phlebotomists cashed the check the Defendants sent them, one former phlebotomist is deceased, and two have not been located.

Defendants have submitted a letter dated June 16, 2006 letter in which they informed O'Neal of the DOL-approved settlements and that, accordingly, there were no potential plaintiffs. (Rec. No. 31, Response, Ex.). Further, the Defendants filed each of the DOL receipt and release forms in the record of this matter on July 3, 3006 with their response to O'Neal's Motion for Conditional Certification of Collective Action. (Rec. No. 28).

Nevertheless, O'Neal has not rebutted any of the Defendant's evidence that there are no other potential plaintiffs in this action due to the DOL-approved settlement. The Court cannot find that O'Neal is similarly situated to the phlebotomists who have signed receipt and release forms, to the three phlebotomists who cashed the back payment check the Defendants sent them, to the former phlebotomist who is now deceased or to the two former phlebotomists who cannot be located. Accordingly, this case does not appear to be appropriate for class certification. Despite having had an opportunity for discovery, O'Neal has not made any factual showing that there are any other potential plaintiffs other than those phlebotomists identified in the DOL-approved audit process.

Most importantly, however, O'Neal and the Defendants have filed cross-motions for summary judgment on O'Neal's FLSA claim. The motions make clear that whether O'Neal was entitled to any overtime pay under the FLSA depends upon the legal issue of whether she was

exempt from the FLSA overtime requirements pursuant to the Motor Carriers Act exemption. If O'Neal was exempt from these requirements, then she would have no claim under the FLSA.

In *Olivo*, the plaintiff loan officers asserted a claim for overtime under the FLSA and moved for conditional certification of a class. 374 F.Supp.2d at 545-46. The court noted that the parties had conducted discovery on this issue and, thus, required the plaintiffs to demonstrate "modest" factual support for the class allegations in their complaint, rather than to simply rely upon the allegations contained in their complaint. *Id*. at 548 n.1. The Defendant argued that the plaintiffs could not make a "modest factual showing" that the Defendant's policy violated the law. *Id*. at 548. Specifically, the Defendant argued that it was exempt from complying with the overtime compensation requirement of § 207(a)(1) because its loan officers qualified for the "outside salesmen" exemption within the meaning of § 213(a)(1). *Id*.

The court found that the outside sales exemption applied to the loan officers. *Id*. at 551. Thus, the court concluded that the plaintiffs were unable to demonstrate that they, and the potential plaintiffs, were "victims of a common policy or plan that violated the law." *Id*. Accordingly, the court found that the Plaintiffs had failed to demonstrate that they were "similarly situated" to other loan officers within the meaning of 29 U.S.C. § 216(b). *Id*. The court, therefore, denied plaintiffs' motion for conditional certification of a class.

As was the case in *Olivo*, O'Neal cannot demonstrate that she and any other potential plaintiffs in this matter were the victim of a *common* policy or plan that *violated the law* if she herself was exempt from the FLSA overtime requirements. Resolution of this issue, as framed by the parties in their motions for summary judgment, depends upon the purely legal issue of whether the Motor Carriers Act exemption applies to O'Neal. Thus, the Court will resolve this issue before

12

granting conditional certification of a class. If O'Neal was exempt from the FLSA overtime requirements, then, as in *Olivo*, the Court cannot find that she and the potential plaintiffs, were "victims of a common policy or plan that violated the law" or that she is "similarly situated" to other current and former phlebotomists within the meaning of 29 U.S.C. § 216(b).

**B.     The Motions for Summary Judgment on FLSA Claim (Rec. Nos. 34 & 35).**

As stated, O'Neal asserts that the Court should rule as a matter of law she was covered by Section 207 of the FLSA while employed by the Defendants and that the Defendants failed to pay her time and half for all of the overtime hours she worked.  (Rec. No. 34, Pfs.' Mot. for Summ. J. at 2). In their Motion for Summary Judgment (Rec. No. 35), the Defendants assert that the Court should rule as a matter of law that O'Neal was not covered by Section 207 while employed by them because she falls within one of the exemptions to the Act found in 29 U.S.C. § 213.

The exemptions to the FLSA's overtime provisions are to be narrowly construed against the employers seeking to assert them.  *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004)(quotations and citation omitted).  "The employer bears the burden of proving that the exemption applies to the employee in question." *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997).  Thus, the plaintiff is entitled to summary judgment unless the defendant can produce sufficient evidence to at least create an issue of material fact as to whether the plaintiff meets each and every element of the exemption.  *Martin*, 381 F.3d at 578. If the defendant fails to produce such evidence, not only must its motion for summary judgment be denied, but summary judgment for the plaintiff must be granted. *Id*.

**1)     The Motor Carriers Act Exemption to FLSA's Overtime Requirements.**

Defendants assert that O'Neal falls within the Motor Carriers Act ("MCA") exemption to the

13

FLSA's overtime requirements found at 29 U.S.C. § 213(b)(1).  This provision states that Section 207 shall not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49."

Section 31502 of Title 49 authorizes the Secretary of Transportation to prescribe requirements for:

> (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and
> (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

49 U.S.C. § 31502(b).

There is no dispute that Defendants do not meet the definition of "motor carrier" as required by Subsection 1.  The issue in this case is whether Defendants meet the applicable definition of "motor private carrier" as required by Subsection 2.  If so, then the Defendants' employees would be exempt from the FLSA overtime requirements.

### 2)      Defendants' Liability under the Current Definition of Motor Private Carrier.

Prior to August 10, 2005, a "motor private carrier" was defined as:

> [A] person...transporting property by motor vehicle when –
> (A) the transportation is as provided in Section 13501 of this title;
> (B) the person is the owner, lessee, or bailee of the property being transported; and
> (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(13)(effective November 26, 2002 to August 9, 2005).

O'Neal was employed by the Defendants from September 19, 2003 until November 28, 2005 (Rec. No. 34, Pf.'s Mot. for Summ. J. at 6).  Near the end of her employment period, the definition

14

of "motor private carrier" was amended by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU") which President Bush signed into law on August 10, 2005. Pub.L. No. 109-59, 119 Stat. 1144 (2005). SAFETEA-LU added the word "commercial" before "motor vehicle" in the definition of "motor private carrier."  49 U.S.C. § 13102(15).

A "commercial motor vehicle" is, in turn, defined as:

[A] self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle–

> (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;
> (B) is designed or used to transport more than 8 passengers (including the driver) for compensation;
> (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
> (D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103.

49 U.S.C. § 49 U.S.C. § 31132(1).

 In *Musarra v. Digital Dish, Inc.*, 454 F.Supp.2d 692 (S.D. Ohio 2006), the district court explained the significance of the amendment to the "motor private carrier" definition as follows:

Before August 10, 2005, the FLSA's MCA exemption applied to most employees who drove any type and size of motor vehicle in interstate commerce. After the passage of SAFETEA-LU, however, vehicles that were previously exempt under the old definition of "motor vehicle" are no longer exempt because they are not "commercial motor vehicles." See Felhaber, Larson, Felon, Vogt, P.A., *Big Changes in Exempt Status for Drivers and Mortgage Loan Officers*, 16 No. 4 Minn. Emp. L. Letter 2, at *2 (June 2006).

*Id*. at 701 n. 19.

Neither party has addressed whether the Defendants are motor private carriers under the

current definition of the term but resolution of this issue is not necessary. Defendants have submitted

evidence that, in late-May 2005, they ceased making the lump-sum bonus payments to phlebotomists

and began paying them time and a half for overtime hours. Accordingly, the  Defendants are not

liable for any payments to phlebotomists since that time.

### 3)	Defendants' Liability under the Prior Definition of Motor Private Carrier.

Again, prior to August 10, 2005, a "motor private carrier" was defined as:

[A] a person...transporting property by motor vehicle when –
(A) the transportation is as provided in Section 13501 of this title;
(B) the person is the owner, lessee, or bailee of the property being transported; and
(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102 (13)(effective November 26, 2002 to August 9, 2005).

Section 13501 of title 40 provides for the Secretary of Transportation's jurisdiction over

transportation between states.  49 U.S.C. § 13501.

In addition, to qualify for the MCA exemption, employees of a motor private carrier must

engage in activities that affect the "safety of operation" of the employer's motor vehicles engaged

in interstate commerce.  *Benson v. Universal Ambulance Service,* Inc., 675 F.2d 783 (6th Cir. 1982);

*Vaughn v. Watkins Motor Line, Inc.*, 291 F.3d 900, 904 (6th Cir. 2002); 49 U.S.C. § 31502(b)(2).

 Defendants assert that the following facts establish that Kilbourne was a "motor private

carrier" prior to August 10, 2005:

1)	O'Neal regularly drove across state lines while performing her assigned duties for Kilbourne;

2)	While driving her car for Kilbourne, O'Neal carried the equipment and materials she needed to perform her duties, including syringes, test tubes, vacutainer needles and other related items, all of which were owned and provided by Kilbourne. O'Neal also carried the patients' blood and other specimens she had drawn or picked up at each

facility; and

3)      O'Neal transported these items to further Kilbourne's commercial enterprise.

(Rec. No. 39, Defs.' Response at 1).

In *Friedrich v. U.S. Computer Services*, 974 F.2d 409 (3rd Cir. 1992), the plaintiffs were field engineers for a company who provided computer hardware and software, installation, maintenance, and repair services of its computer equipment to its customers engaged in the cable television business. *Id*. at 410-11. The field engineers frequently traveled interstate to perform installation, maintenance and repair on customers' computer hardware, carrying tools, component parts, and equipment. *Id*. at 410. The Court found that, "the plaintiffs transported property by motor vehicle in interstate commerce, [the plaintiffs' employer] owned the property transported, and that the plaintiffs transported the property to further [the employer's] commercial enterprise." Thus, the plaintiffs fell within the MCA exemption to the FLSA. *Id*. at 413.

In determining whether the tools, parts, and equipment that plaintiffs transported were "so trivial or insubstantial that they did not constitute property within the meaning of the MCA," the Court determined that, "[b]ecause the plaintiffs transported tools, parts, and equipment without which they could not have performed their duties for [the employer] and the services required of it by its customers, the transportation of those items was an independent and essential reason for their service trips. Thus, the tools, parts, and equipment constituted property within the meaning of the MCA." *Id*. at 417.

There is no dispute that O'Neal, unlike perhaps other phlebotomists employed by the Defendants, regularly drove across state lines while performing her duties for the Defendants. Thus, her transportation while employed by the Defendants was "as provided in Section 13501." Nor is

there any dispute that Kilbourne was the owner of the property O'Neal transported across state lines to perform her duties, including syringes, test tubes, vacutainer needles and other related items. Nor is there any dispute that Kilbourne was the bailee of the blood and other specimens O'Neal transported across state lines. These items were essential for O'Neal to perform her duties. Accordingly, they are "property" within the meaning of the MCA exemption.  Finally, there is no dispute that this property was transported to further a commercial enterprise.  Thus, Kilbourne was a "motor private carrier" as that term was previously defined.   In addition, as the driver of a vehicle engaged in interstate travel, O'Neal affected the safety of operation of the vehicle.

O'Neal does not dispute that Kilbourne was a "motor private carrier" under the prior definition of the term. She argues, however, that she was not exempt from the FLSA overtime requirements because the Department of Transportation has expressly waived its jurisdiction to set the "qualifications and maximum hours of service" for phlebotomists as required under the exemption.  Accordingly, whether or not O'Neal was exempt from the FLSA overtime requirements depends upon this purely legal issue: whether the fact that the Department of Transportation may have waived its jurisdiction to "set the qualifications and maximum hours of service" for phlebotomists means that O'Neal does not fall under the MCA exemption.

Again, the MCA exemption provides that the FLSA's overtime pay requirements do not apply to employees "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1).  O'Neal argues that, pursuant to a Department of Transportation regulation which was in effect until September 30, 2006, 49 C.F.R. § 173.199(a), the Department of Transportation waived its power to set the qualifications and maximum hours of service for

18

phlebotomists.  O'Neal argues that, pursuant to this regulation, the Department of Transportation declined to regulate the qualifications and maximum hours of service of employees who transported "diagnostic specimens" such as the blood and urine samples that Kilbourne's phlebotomists transported.

In *Friedrich*, the Third Circuit was faced with a similar argument.  In that case, the plaintiffs argued that the DOT had waived its power to regulate companies such as the plaintiffs' employer whose employees drove motor vehicles weighing less than 10,000 pounds. *Id*. at 413-14.  The Court rejected the Secretary of Labor's argument that, in determining whether DOT has the "power to establish qualifications and maximum hours of service" for a defendant, the court should interpret the word "power" to mean "power that is actually used" rather than "power that might someday be used." *Id.* at 416. The Court determined that it was not necessary to find that the DOT had actually exercised its power to establish qualifications and maximum hours of service. *Id*.  Instead, "*[t]he existence of the power is enough.*" *Id*. (quoting *Levinson v. Spector Motor Service*, 330 U.S. 649, 678 (1947). The "DOT's election not to regulate lightweight and passenger vehicles does not strip it of its power to establish maximum hours and qualifications for private motor carriers." *Id.*

The *Friedrich* court relied on the Supreme Court's holding in *Southland Gasoline Co. v. Bayley*, 319 U.S. 44 (1943).  At the time of *Southland Gasoline*, the MCA exemption provided that the FLSA overtime requirements did not apply to any employee with respect to whom the Interstate Commerce Commission had power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the MCA. *Id*. at 46.[1] At that time, Section 204 of the

---

[1] In 1966, Congress transferred regulatory power over the employees of motor carriers and motor private carriers to the Department of Transportation.  *Jones v. Centurion Inv. Associates, Inc.*, 268 F.Supp.2d 1004, 1008 (N.D. Ill. 2003).

MCA stated that the ICC had the duty to establish qualifications and maximum hours for employees of private carriers of property by motor vehicle but only "if need therefor is found." *Id.* at 47.

The plaintiff employees recognized that the Commission had "power" to establish maximum hours for the employees. They argued, however, that, because the Commission could only do so "if need therefor is found,"then the employees should not be exempt from the FLSA overtime requirements until "a finding of need by the Commission." *Id.* at 47.

The Supreme Court disagreed, stating that "the *power* to fix maximum hours has existed in the Commission since the enactment of the Motor Carrier Act in 1935." *Id.* (emphasis added). The necessity to make a finding of need before using that power did not affect the existence of the power. *Id.* at 47-48.

In *Benson v. Universal Ambulance Service, Inc.*, 675 F.2d 783 (6th Cir. 1982), the ambulance service defendant argued that its employees were exempt from the FLSA overtime provisions because the Department of Transportation had sole jurisdiction over the wage and hours and conditions of employment of its employees, even though the Department of Transportation had never exercised that jurisdiction. *Id.* at 785. The Sixth Circuit held that, "[s]ince the exemption is phrased in terms of 'power to regulate,' the fact that the Secretary of Transportation has not actually attempted to regulate. . . ambulance services specifically is not significant in determining whether the Motor Carriers Act contemplates such regulation." *Id.*

In this case, even if the Department of Transportation waived its authority to regulate phlebotomists carrying diagnostic specimens as O'Neal asserts, the Department of Transportation would nonetheless still have the *power* to establish their qualifications and maximum hours of service. Thus, phlebotomists would still be exempt from the FLSA overtime requirements pursuant

to the MCA exemption.

O'Neal has not argued that SAFETEA-LU's amendment to the definition of "motor private carrier" is retroactive.  Nevertheless, the Court will briefly address this issue.   The *Musarra* court stated:

> As a threshold matter, the Court notes that retroactive application of SAFETEA-LU is highly disfavored. See *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."); *Michigan Ass'n of Governmental Employees v. Michigan Dep't. of Corr.*, 992 F.2d 82, 84 (6th Cir.1993) (noting that "the FLSA does not authorize retroactive rulemaking"). SAFETEA-LU does not include any language evincing Congressional intent to apply the amendment retroactively, and such a finding would result in confusion and unfairness [to] various individuals who until August 10, 2005 were exempt.

*Musarra*, 454 F.Supp.2d 692 at 703; *see also Dell'Orfano v. Ikon Office Solutions, Inc.*, 2006 WL 2523113 (M.D. Ga. 2006)(amendment does not apply retroactively).

Retroactive application of a statute is improper if such application "would impair rights a party possessed when [the party] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).  The SAFETEA-LU amendment became effective August 10, 2005.  Retroactively applying it would increase the Defendants' liability for past conduct or impose new duties with respect to transactions already completed. Accordingly, the SAFETEA-LU amendment should not apply retroactively.

Accordingly, as a matter of law, O'Neal was exempt from the FLSA overtime requirements while employed by the Defendants. Accordingly, her Motion for Summary Judgment on this issue must be denied and the Defendants' Motion for Summary Judgment on this issue must be granted. Furthermore, because O'Neal was exempt from the FLSA overtime requirements, the Court cannot

find that she together with any other potential plaintiffs were the victims of a common policy or plan that violated the law. Nor can the court find that O'Neal is "similarly situated" to any other potential plaintiff asserting a claim for overtime under the FLSA. For this reason, as well as the others previously stated, the Court must deny O'Neal's Motion for Conditional Certification of Collective Action and for Court-Approved Notice to Members of Collective Class (Rec. No. 27).

      **C.**      **O'Neal's State Law Claims.**

In addition to her FLSA claim, O'Neal asserts a claim under Kentucky's Wage and Hours Law at KRS §§ 337.020 and 337.285, a state law claim of breach of contract based on the Defendants' Employee Handbook, and a state law claim of wrongful discharge.

This Court has original jurisdiction over all civil actions where the amount in controversy exceeds $75,000 and is between citizens of different states. 28 U.S.C. § 1332(a)(1). The Court also has original jurisdiction over all civil actions arising under federal Constitutional or statutory law. 28 U.S.C. § 1331. Accordingly, this Court had original jurisdiction over O'Neal's FLSA claim. O'Neal's FLSA claim also gave this Court supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367(a).

In light of the Court's dismissal of O'Neal's FLSA claim, however, the Court has discretion to decline to exercise supplemental jurisdiction over O'Neal's state law claims if the amount in controversy does not exceed $75,000. 28 U.S.C. § 1367(c)(3). In fact, "[w]here a district court has jurisdiction over a state law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the state law claims should be dismissed without reaching their merits." *Sharwell v. Selva*, 4 Fed. Appx. 226, 227 (6th Cir. 2001)(citing *Faughender v. City of North Olmsted, Ohio*, 927 F.2d 909, 917 (6th Cir. 1991).

22

If, on the other hand, the amount in controversy on these claims exceeds $75,000, then it appears the Court would have original jurisdiction over the claims since there is complete diversity of citizenship. Accordingly, the Court will direct O'Neal to file a brief within 10 days of the entry date of this Order stating the amount in controversy on her state law claims. If Defendants would like to respond, they should do so within 10 days of their receipt of O'Neal's brief. O'Neal may file a reply brief within five days of receipt of the Defendants' response.

The Defendants' Motion for Summary Judgment on O'Neal's state law claims will be DENIED as moot pending the Court's determination of its jurisdiction over those claims. Likewise, O'Neal's Motion to Extend Deadline to file Rule 26(a)(2) Expert Disclosures, to Complete Discovery and to File Dispositive Motions (Rec. No. 30) will be DENIED as moot pending the Court's determination of its jurisdiction over the claims remaining in this action. If the Court should determine it has jurisdiction over O'Neal's state law claims, both parties may reassert these motions.

### D.    CONCLUSION.

For all the above reasons, the Court hereby ORDERS as follows:

1) Plaintiff's Motion for Conditional Certification of Collective Action and for Court-approved Notice to Members of Collective Class (Rec. No. 27) is DENIED;

2) Plaintiff's Motion for Summary Judgment (Rec. No. 34) is DENIED;

3) Plaintiff's Motion to Extend Deadline to File Rule 26(a)(2) Expert Disclosures, to Complete Discovery and to File Dispositive Motions (Rec. No. 30) is DENIED as moot pending the Court's determination of its jurisdiction over O'Neal's state law claims;

4) Defendants' Motion for Summary Judgment (Rec. No. 35) is GRANTED as to Plaintiff's FLSA claim and that claim is hereby DISMISSED. The motion is otherwise DENIED as

moot pending the Court's determination of its jurisdiction over Plaintiff's state law claims; and

5)    The Plaintiff SHALL FILE a brief within 10 days of the entry date of this Order stating the amount in controversy on her state law claims.  Defendants may respond within 10 days of their receipt of Plaintiff's brief.  Plaintiff may file a reply brief within five days of receipt of the Defendants' response.

Dated this 28th day of March, 2007.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**